# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 05 CR 168** |
| | ) | **Judge Joan H. Lefkow** |
| **NABIL SMAIRAT,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Nabil Smairat ("Nabil") is charged with wire fraud and money laundering and his property is the subject of a forfeiture allegation. *See* Indictment, Dkt. No. 1; 18 U.S.C. §§ 1343, 1957, 2; 28 U.S.C. § 2461(c); 18 U.S.C. § 981(a)(1)(C). Nabil has moved under Federal Rules of Criminal Procedure 41(h) and 12(b)(3)(C) to suppress evidence that was seized during a search of his home, including documents, currency, and other tangible objects. On June 1, 2006, this court granted Nabil's request for an evidentiary hearing to determine whether consent given by his brother, Michil Smairat ("Michil"), to search his house was voluntary, whether Michil had actual or apparent authority to consent to a search of containers within the house, and whether the later consent given by Nabil's wife, Barbara Smairat ("Barbara"), was voluntary. *See* Memorandum Decision of June 1, 2006, Dkt. No. 54, at 7. The court held such a hearing on December 15, 2006 and continued it on May 9, 2007 and May 15, 2007. For the reasons set forth below, Nabil's motion to suppress [#18, #21] is granted. All evidence obtained during the April 15, 2003 search of Nabil's home will be suppressed.

# I. Relevant Facts[1]

## A. Introduction[2]

Nabil was arrested in Cincinnati on April 15, 2003 as part of "Operation Northern Star," a nationwide takedown involving the diversion of pseudoephedrine for the production of methamphetamine.[3] Knowing this,[4] federal agents of the Drug Enforcement Administration ("the DEA") and the Internal Revenue Service ("the IRS") decided to go to Nabil's house, 2526 Braddock Drive in Naperville, Illinois ("the Smairat home"), to try to get consent to search it. The agents did not have probable cause to search the Smairat home. Testimony of Joseph Schihl, Transcript of Dec. 15, 2006, at 24:10.

DEA agents Joseph Schihl ("Schihl"), Robert Glynn ("Glynn"), and Jack Howard ("Howard"), and Michael Daniels of the IRS ("Daniels"), among others, met at a command post that had been set up for Operation Northern Star at the Oak Lawn Police Department. They were briefed on Nabil's identity,[5] the location of his house, and the things that they should look for,

---

[1] These facts are based on the evidence presented at the evidentiary hearing, at which Michil, Barbara, David Ditmars, Rebecca Hamilton, Drug Enforcement Administration Agents Joseph Schihl, Robert Glynn, Jack Howard, and Larry Johnson, and Internal Revenue Service Agent Michael Daniels testified. Michil testified through the assistance of an Arabic interpreter. In addition, the court credits certain undisputed facts set forth in the parties' submissions concerning this motion as well as the evidentiary hearing.

[2] All facts in this introductory section are undisputed.

[3] Nabil was originally arrested on a complaint that he conspired to possess a List 1 chemical (pseudoephedrine) which may be used to manufacture a controlled substance, knowing and intending and having reasonable cause to believe that it would be used to manufacture a controlled substance, in violation of 21 U.S.C. §§ 841(c)(1) and 846. Those charges were later dropped.

[4] *See* Testimony of Joseph Schihl, Transcript of Dec. 15, 2006, at 19.

[5] Daniels, the co-IRS case agent for Operation Northern Star, was involved in the investigation before the takedown on April 15, 2003. Daniels believed that Nabil was a "financier of sorts. He was allegedly financing some of the pseudo[ephedrine] deals as I understood it. He also came up on a wire that DEA had. His name came up and ... he had a number of calls back and forth between [] some of the folks who were arrested that day.... I believe [Nabil] had a store called Smart Choice Foods, and that USDA had shut down his [LINK card] machines for

which included LINK materials. Daniels believes that the agents would have been told at the command post to look for LINK card machines, rolls of LINK card tapes, accounting ledgers that would show the activity of the stores, bank documents, checks, and anything financial. None of the agents were able to testify about what they were told regarding who lived in the house. *See, e.g.*, Testimony of Glynn, Transcript of May 9, 2007, at 114.

The Illinois LINK program allows food stamp recipients to access their benefits electronically via the use of a LINK card, which looks like a credit card. In connection with Operation Northern Star, LINK materials were potentially relevant because some agents believed that there was a connection between pseudoephedrine and LINK card fraud: in theory, people dealing in pseudoephedrine have an excess of currency and people involved in LINK card fraud need extra currency. Nabil's current indictment alleges that he, as the owner of a grocery store ("Smart Choice Foods" or "Smart Choice"), illegally paid his customers cash for their LINK benefits in an amount below the face value of the benefits, which allowed him to retain the difference as his own profit when he was reimbursed by the government at the face value.

### B. The Agents' Version of Events

What happened when the agents arrived at the Smairat home is the critical issue in dispute for purposes of this motion. The agents' version of events, supplemented with some undisputed facts, is as follows. Schihl, Glynn, and three other agents arrived at Nabil's house at approximately 1:30 P.M. Not far behind them were Daniels and several more agents. All of the agents were armed with concealed weapons. Schihl, Glynn, and one other agent walked up

---

excessive using, indicative of food stamp fraud." Transcript of May 15, 2007. Schihl and the other agents do not recall having any knowledge of Nabil's alleged involvement with LINK fraud before going to Nabil's house.

Nabil's driveway and met Michil, who was standing near the garage smoking. The agents introduced themselves and told Michil that they were conducting a narcotics investigation. One of them asked permission to pat Michil down for weapons, which Michil granted.

Glynn asked Michil if he lived at the Smairat home. Michil produced a driver's license with 2526 Braddock Drive listed as his address. Michil spoke with a noticeable accent. The agents asked Michil how long he had lived there. Michil told them he had lived there for approximately one month. The agents asked if Michil had access to all areas of the house (meaning whether he could physically go anywhere in the house), and he said that he did.[6] The agents then asked if there were drugs in the house and if they could look inside. Michil said there were not and invited the agents in.

Inside, Michil sat down at the kitchen table. Schihl filled out the top portion of a consent to search form. Howard read the form to Michil. No one informed Michil that he could refuse to sign the consent form or that if he refused, the agents would leave. Michil signed it and Glynn witnessed it.[7] The tone of the conversation was very friendly and Michil was very cooperative

---

[6] The agents did not ask Michil any further questions regarding his access to any particular areas or containers in the house at this or any later time. *See, e.g.,* Testimony of Daniels, Transcript of May 15, 2007, at 214; Testimony of Schihl, Transcript of Dec. 15, 2006, at 41.

[7] The entirety of Michil's consent to search form reads as follows. Barbara's form is almost identical.

DEPARTMENT OF JUSTICE
DRUG ENFORCEMENT ADMINISTRATION
CONSENT TO SEARCH

1. I have been asked to permit special agents of the Drug Enforcement Administration to search: (Describe the person, places or things to be searched.)
2526 Braddock Dr.
Naperville, IL 60565

2. I have not been threatened, nor forced in any way.

3. I freely consent to this search.

4

and helpful.  The agents then began their search.  After doing a preliminary sweep for weapons, Schihl went to the front door to invite Daniels and his team inside to join the search.  Howard sat with Michil at the kitchen table for the next 30 to 45 minutes.  No children or other family members were present at the house at that time.

In the basement the agents found shelving units, drawers, filing cabinets, numerous boxes, a locked safe, and various household items.  Schihl discovered an open box containing LINK materials.  The agents took boxes off of shelves, opened them, and searched them.  They searched filing cabinets and drawers.  They also pried open the locked safe to search it, although they did not find anything of interest inside.  No agent was able to recollect whether any of the containers had any external markings or labels that identified their contents.  *See, e.g.,* Testimony of Daniels, Transcript of May 15, 2007, at 211; Testimony of Schihl, Transcript of Dec. 15, 2006, at 38.  No agent testified that the appearance of the LINK box, any other container, or anything that they saw inside any open (or closed) container gave them probable cause to believe that they had found evidence of a crime.  *See* Testimony of Joseph Schihl, Transcript of Dec. 15, 2006, at 40:16.  The agents seized anything that was financial in nature, any bank statements, anything related to the stores that Nabil owned, including Smart Choice and a Subway restaurant,

---

04/15/2003        /s/ Michil Smairat
Date              Signature

Witnesses:        /s/ J Howard
                  /s/ Robert Glynn

DEA Form
(Oct. 1983) - 88          Previous edition dated 3/76 is Obsolete.

Government Exhibit 1.

anything LINK card related, and anything with the names of other "players" who had been arrested that day. Testimony of Daniels, Transcript of May 15, 2007, at 193, 215-16.[8]

Glynn and Howard searched the garage. They seized a 2002 Jeep and drove it to a government warehouse. Glynn and Howard did not have knowledge that the Jeep was evidence of a crime; they had merely been told at the command post to seize the Jeep if it was found at the Smairat home. Other agents searched the rest of the house, including the office (where Michil stayed), the kitchen, the master bedroom, the guest room, and Nabil's daughters' bathroom.

At various points during the afternoon, there were between 12 and 25 agents on the premises. Agent Larry Johnson of the DEA ("Johnson"), a specialist in financial investigations, was called to the scene to assist with the search because of the discovery of LINK documents and also because additional help was needed to carry the numerous boxes out of the house. He arrived between 3:00 P.M. and 4:00 P.M.

At some early point in the search, Schihl called Barbara at work to inform her that her husband had been arrested and that federal agents were searching her house.[9] Barbara said she would come home. When she arrived, agents were in the process of taking boxes out of the house and loading them into government vehicles. Schihl was outside waiting for her. Schihl

---

[8] Nabil contends in his Supplemental Motion to Suppress, Dkt. No. 21, at 3-4, that "Upon reviewing [the seized materials] at the United States Attorney's Office, it became apparent that the entirety of these materials came from file cabinets, safes or other closed containers [kept] in the basement, office or the bedroom of Nabil and his wife, Barbara Smairat. A review of these documents further revealed that they all pertain to various business entities controlled by Nabil Smairat, or the personal finance records of Nabil and Barbara Smairat. Additionally, the examination of the records indicated that most, if not all of the documents, were removed from file cabinets, safes, or other closed containers that were clearly labeled as containing the business and/or personal records of Nabil and Barbara Smairat." This was not contested by the agents' testimony, although it was generally contested by the government in its brief.

[9] Schihl did not recall the specifics of the conversation, when it took place, or whether he called Barbara or she called him. Testimony of Schihl, Transcript of December 15, 2006, at 9-10.

and Barbara went inside and sat down at a table in the office. Schihl told her that Nabil had been arrested in Cinncinnati but that he didn't know what charges Nabil faced. Barbara was upset that her husband had been arrested but was not upset about agents seizing her belongings. She said that it was okay that Michil had consented to the search. Schihl asked her if she would consent to the search too. Barbara signed a consent form, which Schihl witnessed. Johnson came into the room after Barbara had signed the form. Schihl asked Johnson to witness the consent form. Johnson asked Barbara if she had read the form, if she understood it, and if it was okay if the agents searched her house. Barbara said yes. The tone of this conversation was friendly and casual. During their conversation, Barbara could hear footsteps in the master bedroom overhead.

Schihl then asked Barbara whether she had ever seen her husband with more than $100,000 in cash. Shortly thereafter, an agent approached Schihl to say there was something in the basement that he should see. Schihl brought Barbara downstairs with him, where Daniels and the other agents had just found $260,000 wrapped in plastic inside a Crock Pot, which was found on a shelf. They asked Barbara if she had ever seen that money before. In bewilderment, Barbara said that the money was not in her house, but the agents assured her it was.

Sometime after Barbara signed the consent form, an agent asked her to go upstairs with him. Before going, she asked permission for Michil to leave to pick up her older daughter, Amanda, from school, and to take both of her daughters to a McDonald's to play. Permission was granted. When Barbara got to her bedroom, she saw that agents had already searched her nightstand drawers and her walk-in closet and had found locked boxes containing personal items belonging to her. The agents wanted access to these boxes and Barbara helped to open them because she was afraid that the agents might otherwise damage the boxes. The agents had also

found and opened a fire-proof box that was kept closed (but unlocked) in Nabil's closet and that contained documents such as passports, birth certificates, and marriage certificates.[10]

Before they left, the agents had Barbara sign a receipt indicating all of the materials that they were seizing. The agents seized 18 boxes of documents from the basement, a 2002 Jeep and its title, paperwork from the Jeep, four computers found in various locations in the house, paperwork from upstairs (possibly including Nabil's passport), a large amount of United States currency from the basement (the $260,000), and numerous keys found throughout the house. Defendant's Exhibit 1. Barbara signed the receipt, as did Schihl, and this concluded the search.

### C. The Smairats' Version of Events

The first disputed issue of fact is the time that the agents arrived at the Smairat home. Michil testified that they arrived at approximately 11:30 A.M. He remembered that because he had just picked up Nabil and Barbara's younger daughter, Taylor, from kindergarten at 10:45 A.M. and brought her home. After making her lunch, he went outside to smoke a cigarette.

The second and most critical disputed issue of fact concerns the manner in which the agents approached Michil. Michil says that he was opening the garage door to go outside for his cigarette when he first encountered the agents. The agents immediately screamed, rushed towards him with their guns drawn, pushed him against a wall, frisked him violently, handcuffed him, and demanded to know where his weapons were and who was in the house. They then pushed him into the house and sat him down at the kitchen table. The agents immediately spread throughout the house to search.

---

[10] The facts in this paragraph are taken from Barbara's testimony but were not disputed by the government.

About 15 minutes later, the agents asked Michil where his sister-in-law was, whether she was American, and where she worked. Michil directed them to her phone number posted on the refrigerator. An agent called Barbara at work and left a message indicating that her husband had been arrested and that federal agents were searching her home. Taylor came downstairs to ask Michil what was happening. He told her everything was okay and that she should stay upstairs and watch cartoons.

Michil informed the agents that he had recently arrived in the United States from Jordan and that he had been living at 2526 Braddock Drive with his brother for about one month. The agents asked Michil where in the house he slept, to which he responded the office adjacent to the kitchen. The agents then searched the office and found Michil's driver's license. The license listed 2526 Braddock Drive as Michil's address. Schihl used this license to fill out portions of a consent to search form.

The agents then put the form in front of Michil and told him to sign it, which he did. Michil did not read the form before signing it, despite the fact that it was a short and simple form and he could have read it. He felt that he did not have a choice whether to sign the form, although he concedes that he was not specifically threatened that something would happen if he failed to sign it. He is diabetic and was not feeling well. At some point he asked permission to take his insulin, which was granted, and then he felt better.[11]

---

[11] The agents specifically deny Michil's account of the events and contend that they used no force at all. Testimony of Schihl, Transcript of Dec. 15, 2006, at 15-16, Transcript of May 9, 2007, at 96-98; Testimony of Glynn, Transcript of May 9, 2007, at 105-12; Testimony of Howard, Transcript of May 9, 2007, at 125-31; Testimony of Daniels, Transcript of May 15, 2007, at 187-89.

9

The third and final dispute is in regard to the agents' treatment of Barbara on her arrival and the sequence of events surrounding her consent. Barbara testified that she received the message from Schihl upon returning from her lunch break at 1 P.M. She rushed home, arriving at approximately 1:30 P.M. Barbara was very emotionally upset and exclaimed that it was all a big mistake. Schihl assured her that it was not a mistake. They went inside and sat down to talk in the office. Barbara saw Taylor cowering on the couch near the kitchen and the office. Barbara explained that Nabil was out of town visiting a gas station that he intended to purchase. Schihl told her that there was no gas station and that Nabil had been arrested on drug charges. Schihl confronted Barbara with a document showing that her house was paid off and asked how it could be paid off if Nabil was not involved in something illegal. He implied that if Barbara did not cooperate with him, he might think that she was involved. Schihl asked Barbara to sign a consent form and said that it would show that she was cooperating if she signed it, but also that he did not need her to sign it because the search was perfectly legal based on Michil's consent since Michil had a driver's license with the Smairats' address.

Before signing the consent form, Barbara was taken downstairs to the basement. She noticed that boxes and drawers had been opened, things had been moved around, papers had been taken out and put on top of dressers, and the safe had been pried open. All of these containers were located on the side of the basement used only by Nabil. The agents held up the cash that they had found to show Barbara and asked her where it came from. Barbara then returned to the office with Schihl and Howard. Howard asked her if there was any other money in the house or any guns in the house. Using a strong tone and intimidating body language, he said she needed to cooperate with them because otherwise they would tear the house apart to find what they

wanted. Schihl and Howard then gave Barbara the consent form and told her to sign it. Barbara did sign the consent form. She did not read it before signing it, but she knew that she was signing a consent to search form and she admits that she could have read it before signing it.[12]

Michil testified that he did not feel that he had authority to invite strangers into his brother's house. He never went into the basement of the Smairat home before April 15, 2003. Barbara was not aware of Michil's ever having occasion to go in the master bedroom. Nabil and Barbara did not give him any authority over their personal or financial records. Michil did not use at least three of the computers that were seized, and he did not use the Jeep. Additionally, Michil was not involved with the Smart Choice business or the Smairats' Subway restaurant.

### D.    The Neighbors' Testimony

David Ditmars ("Ditmars") witnessed the scene outside the Smairat house. His parents live next door to the Smairats. In April of 2003, he had occasion to go to his parents' house often because his father was in a hospital in Naperville. On April 15, 2003, he drove from the hospital to his parents' house to check on the dog. He believes that this was before 12:00 P.M. because he had not yet had lunch. When he pulled onto Braddock Drive, he saw 12-15 cars parked on the street and was not able to drive all the way to his parents' driveway. He saw 20-25 people on the Smairats' driveway and their front and side lawn. They had guns, some were wearing badges, some wore black bullet-proof vests with yellow lettering on the backs, and some had thigh holsters for their guns. The Smairats' garage door was closed. One agent was crouched down in a position that looked like he was getting ready for action and had his hand on his gun. Ditmars

_____

[12] The agents specifically deny Barbara's account of the timing of her consent in relation to being shown the cash and also deny making any intimidating statements to her. Testimony of Schihl, Transcript of Dec. 15, 2006, at 53, 56-67, Transcript of May 9, 2007, at 97-98.

described the scene, "To me it looked like ... [the Smairats'] house was getting ready to be raided. It was kind of alarming to me." Transcript of May 9, 2007, at 86.

Ditmars went inside his parents' home, quickly used the bathroom, and grabbed a phone to call his sister to tell her what was happening. Five to seven minutes later, he looked at the Smairat home again and saw that the garage door had opened and agents were in the garage with bags and boxes. A van pulled into the Smairats' driveway and the agents began to load it.

Rebecca Hamilton ("Hamilton"), who lives across the street from the Smairats, also noticed the scene. She works part time at a school and leaves work at 11:30 every day, so she knows that she arrived home at approximately 11:45 A.M. to 12:00 P.M. on April 15, 2003. She saw between six and ten cars on the street when she got home. People were walking around the Smairats' foyer, and at least ten people went in and out of the Smairats' front door. Not long after noon, Hamilton saw one man with a visible gun in a holster. At 2:30 P.M., she saw Taylor and Michil outside.

### E.    Findings of Fact[13]

#### 1.    Time of Arrival

The court finds that the agents arrived at the Smairat home between 11:30 and 11:45 A.M. Michil's specific recollection is corroborated by the testimony of two unbiased witnesses, neighbors Ditmars and Hamilton, who both had well-supported reasons for remembering that the time was around 11:30 to 11:45 A.M. Additionally, Barbara's well-supported testimony that she must have arrived home near 1:30 P.M. conflicts with the agents' testimony that 1:30 P.M. is when they first arrived, because everyone agrees that Barbara was not

---

[13] The court makes these findings of fact solely for the purpose of resolving this motion.

home until some time after the agents arrived.  It appears that the agents' testimony on this issue is based not on independent recollection but on the time noted on a written report, which they reviewed prior to their testimony.  *See* Testimony of Schihl, Transcript of Dec. 15, 2006, at 18:22; Testimony of Glynn, Transcript of May 9, 2007, at 137-38; Testimony of Howard, Transcript of May 9, 2007, at 139:10; Testimony of Daniels, Transcript of May 15, 2007, at 203.

### 2.    Use of Force on Michil

The court finds that the agents used coercive force in their initial encounter with Michil. Although the weight of the evidence suggests that what actually happened was something in between Michil's story and the agents' story, the court credits Michil's testimony, corroborated by the neighbors, that the number of agents present when first contact was made was more likely at least a dozen than only three.  The court finds that the garage door was closed when the agents arrived.  Because the agents believed that Nabil was involved in drug trafficking and were prepared for the possibility of danger, as reflected in the number of armed agents present and their own statements,[14] Michil's testimony that they rushed towards him with guns drawn when the garage door suddenly opened is credible.  Finally, the court's finding that the agents used coercive force is supported by their own testimony as to their conduct within the home: that they pried open a locked safe in the basement, an act that was plainly outside of Michil's actual or apparent authority to consent.  This indicates either bad faith or ignorance of the applicable law (as discussed below) on the part of the agents.

---

[14] *See, e.g.,* Testimony of Glynn, Transcript of May 9, 2007, at 117-19 ("Q.: And what led you to believe that Michil Smairat posed any danger to you?  A. The fact that he was at a residence which possibly contained large amounts of drug proceeds, the fact that he was involved in a nation – this house – rather was involved in a nationwide drug conspiracy.  The fact that it was the middle of the day, and he was just standing outside his garage looking around.").

The court credits Michil's testimony that the agents frisked him without asking permission first but does not credit the testimony that the agents were violent. The nature of the dialogue between the agents and Michil was not friendly. He could see many agents surrounding the house, some with visible gun holsters. The agents used a strong tone of voice, and it is reasonable to credit Michil's testimony that he was intimidated. Michil allowed the agents to come inside. They presented a consent to search form to him and communicated that he should sign it. No one read it to him. Due to the pressured nature of the situation, he signed it without reading it.[15] Michil did not fully comprehend what the agents would do if he signed the form.

### 3.     Circumstances Surrounding Barbara's Consent

The court finds that Barbara was shown the $260,000 in the basement before signing the consent to search form. This is because her memory of the sequence of events and the details of the scene was very specific whereas the agents' collective memory was generally vague. Additionally, it is not credible that Schihl coincidentally asked Barbara whether she had ever seen her husband in possession of in excess of $100,000 right before the agents happened to find a huge stash of cash in the basement, as Schihl contends. The court also finds that Schihl told Barbara that the search was legal based on Michil's consent.[16]

---

[15] The government has argued that because Michil was careful in the past when he signed other forms, such as forms relating to the sale of a home or the incorporation of a business, his testimony that he signed the consent to search without reading or understanding it is incredible. Michil said that when signing business documents before April 15, 2003, he "took time so that it [was] translated and I [understood] 100 percent before I would sign anything." Transcript of Dec. 15, 2006, at 53:18. Michil's practices in those distinct situations have little bearing on how he was likely to respond to an incident such as the instant one, however, because of how intimidated and pressured he felt at the time, the unavailability of a translator, and the impracticability of asking for one.

[16] Because the court finds below that Barbara's consent was tainted by the agents' earlier unreasonable search, it is not necessary to resolve other factual disputes regarding whether her consent was voluntary. If this holding is questioned on appeal, however, the court notes that it is not believable that the agents' conversation with Barbara was "friendly and casual" when she had just arrived home, found federal agents removing boxes of her belongings while her kindergartner cowered on the couch, and learned that her husband had been arrested on drug

### 4.     Status of the Box of LINK Material

Although the parties did not focus on the issue, the court has considered the credibility of the agents' testimony that the box containing LINK materials was open when they found it. *See* Testimony of Schihl, Transcript of Dec. 15, 2006, at 8:7. The court finds this testimony not credible, because it is highly improbable that the one box that contained the evidence whose admissibility the agents are most interested in just happened to be open, and because this is the only detail concerning the appearance of the boxes that Schihl or any of the other agents claim to be able to remember. Additionally, the court notes that the agents were willing to open other containers that were closed and even locked, which questions their credibility on this point.

## II.     Background

### A.     Consent searches

One of the specifically established exceptions to the Fourth and Fourteenth Amendments' requirement for a warrant issued upon probable cause is a search that is conducted pursuant to voluntary consent. *Schneckloth* v. *Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 36 L. Ed. 2d. 854 (1973). Factors to be considered in determining voluntariness include "(1) the age, education and intelligence of the defendant; (2) whether defendant was advised of his constitutional rights; (3) the length of [any] detention prior to consent; (4) whether defendant consented immediately or police made repeated requests for consent; (5) whether physical coercion was used; [and] (6) whether defendant was in custody.[17] *U.S.* v. *Biggs,* – F.3d –, 2007

---

charges. *Compare* Testimony of Schihl, Transcript of Dec. 15, 2006, at 11:21; Testimony of Johnson, Transcript of May 15, 2007, at 172.

[17] Being in custody, even without having received *Miranda* warnings, does not necessarily render consent given at that time involuntary. *United States* v. *Renken*, 474 F.3d 984, 988 (7th Cir. 2007).

WL 1704104, at *4 (7th Cir. June 14, 2007) (citation omitted). "Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." *Schneckloth*, 412 U.S. at 248-49. Additionally, the court must consider the number of officers present, what show of force they made, whether they were armed and whether their weapons were visible. *United States* v. *Groves*, 470 F.3d 311, 322 (7th Cir. 2006). The government has the burden of proving voluntariness by a preponderance of the evidence. *Id.* at 222 (citations omitted); *Groves*, 470 F.3d at 322.

"When the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied." *Schneckloth*, 412 U.S. at 248-49. On the other hand, if the subject of a search *has* been seized, the court must first determine whether that seizure was reasonable before moving on to determine voluntariness. "As a general rule, if a seizure of a suspect ... is illegal, [it] will vitiate the suspect's subsequent consent to a search unless the state proves that the consent 'resulted from an independent act of free will.'" *United States* v. *Pedroza,* 269 F.3d 821, 828 (7th Cir. 2001) (citation omitted). "In determining whether the consent is sufficiently distinguishable from the primary taint, three factors are relevant: '(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct,' although none of these factors alone is

determinative." *Id.* (citing *Wong Sun* v. *United States*, 371 U.S. 471, 521, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

### 1.    Third party consent

Consent may be given by a third party who has actual or apparent authority over the property. *Illinois* v. *Rodriguez*, 497 U.S. 177, 181, 186-89, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). The relevant question for determining actual or apparent authority to consent is whether a third party has joint access or control of the premises for most purposes, or whether that third party appears to have such joint access or control to a reasonable officer. *United States* v. *Groves*, 470 F.3d at 319; *see also United States* v. *Matlock*, 415 U.S. 164, 171-72, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974).[18] When a third party gives consent to search property over which a defendant has joint authority, the defendant may challenge the validity of that consent. *United States* v. *Celliti*, 387 F.3d, 618, 621 (7th Cir. 2004). The government has the burden to show actual or apparent authority. *Illinois* v. *Rodriguez,* 497 U.S. at 181.

The apparent authority doctrine can justify searches made based on reasonable mistakes of fact only, not mistakes of law. *United States* v. *Ruiz*, 428 F.3d 877, 881 (9th Cir. 2005) (citing *United States* v. *Welch*, 4 F.3d 761, 764-65 (9th Cir. 1993)). Furthermore, if officers do not have enough information to determine whether the third party has authority to consent to a search, they cannot proceed with willful blindness. "Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property,

---

[18] Factors to be considered regarding actual or apparent authority over a residence include the following: (1) possession of a key; (2) admission that the third party lives at the residence; (3) possession of a driver's license listing the residence as the third party's address; (4) receiving mail and bills at the residence; (5) keeping clothing at the residence; (6) having one's children reside at the residence; (7) keeping personal belongings at the residence; (8) performing household chores at the residence; (9) being on the lease for the premises and/or paying rent; and (10) being allowed on the premises when the owner is not home. *Groves*, 470 F.3d at 319 (citations omitted).

'warrantless entry without further inquiry is unlawful.'" *United States* v. *Waller*, 426 F.3d 838, 846-47 (6th Cir. 2005) (citing *Rodriguez*, 497 U.S. at 188-89 and other cases in accord).

## 2. Containers

Courts must independently consider whether a third party has the authority to consent to a search of a residence and whether the third party has authority to consent to particular containers within that residence. *Groves*, 470 F.3d at 320; *see also United States* v. *Karo,* 468 U.S. 705, 725-26, 104 S. Ct. 3296, 82 L. Ed. 2d 530 (1984). Consent to search a room is not necessarily sufficient for officers to search closed containers within that room. *United States* v. *Rodriguez*, 888 F.2d 519, 523 (7th Cir. 1989). The officers must consider whether the scope of the consent can be reasonably understood to extend to particular containers, *Florida* v. *Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991) (distinguishing between the reasonableness of searching a paper bag pursuant to a general consent to search for drugs in a car and the unreasonableness of searching a locked briefcase pursuant to such a consent), and also whether it is reasonable to believe that the party consenting to the search has authority over those containers. *Ruiz*, 428 F.3d at 882.

In this situation, "apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of whether the individual has authority over the property." *United States* v. *Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) (citations omitted).

> This analysis also entails the consideration of other, related factors. The first one is the nature of the container.... Thus, for example, it is less reasonable for a police officer to believe that a third party has full access to a defendant's purse or a briefcase than ... an open crate.... Courts also look at external markings on the container -

> such as the defendant's name or the third party's name - in an effort to gauge the reasonableness of an officer's belief that the third party had use of the container.... [A]lso relevant are the precautions taken to ensure privacy, such as locks ...."

*Id*. at 834-35 (citations omitted). But "[a]lthough certain types of containers ... do command high expectations of privacy, this does not mean that other types of containers in which people store their personal belongings command no expectation of privacy. The Fourth Amendment protects people from unreasonable searches; whether a search is reasonable depends on *all* the circumstances, not just on whether a container happens to be a suitcase, valise, purse, footlocker, or cardboard box." *United States* v. *Fultz*, 146 F.3d 1102, 1105 (9th Cir. 1998) (emphasis in original).

"[A]n officer may ... seize an incriminating item not within the scope of the consent if it is in 'plain view.' The seizure of an item that falls outside the scope of a consent search is within the plain view exception [to the warrant requirement] if: (1) the officer was lawfully present in the place from where he viewed the item, (2) the item was in plain view, and (3) its incriminating nature was 'immediately apparent.'" *Celliti*, 387 F.3d at 623 (citing *United States* v. *Raney*, 342 F.3d 551, 558-59 (7th Cir. 2003)).

## III.    Discussion

### A.    Actual or apparent authority

Nabil argues that Michil did not have actual or apparent authority to consent to a search of the containers in his basement, office, and master bedroom and, therefore, any evidence that was found in those containers must be suppressed.[19] It is not clear where exactly all of the seized

---

[19] Nabil does not argue that Michil did not have general authority to consent to a search of his house.

evidence was found because the government chose not to focus on this issue at the evidentiary hearing. We know from the testimony and from Defendant's Exhibit 1 (the DEA receipt for items seized) that the agents seized 18 boxes of financial and business records (including personal financial records belonging to Nabil and Barbara) from the basement and that those documents were located in closed boxes, filing cabinets, drawers, shelving units, and perhaps a locked safe. The Jeep, its title, and paperwork found inside the Jeep were seized. Four computers were seized, two of which were found in the basement and one in the office. The $260,000 was found in a Crock Pot. Some documents were taken from a closed fire-proof box in Nabil's bedroom closet. Finally, various keys found throughout the house were also seized.

Nabil contends in his Supplemental Motion to Suppress that all of the containers (including the boxes in the basement) were clearly labeled as being his and his wife's personal financial and business records, and that if any of them were not clearly labeled, the nature of the contents should have been immediately obvious. The government maintains in its brief that the containers consisted "mostly" of generic boxes and were not otherwise marked as containing something outside of Michil's authority, but none of the agents had any specific recollection of whether the containers were marked or not. Regardless, the government did not offer any of the boxes into evidence or demonstrate which documents were found in such "generic" boxes and which documents were found in other locations, such as the filing cabinets or the closed fire-proof box in Nabil's closet.

The agents knew from their interaction with Michil that he was Nabil's brother from Jordan, that he had been living at the Smairat home for approximately one month, that he had a driver's license that listed 2526 Braddock Drive as his home address, that he slept in the office,

and that he was permitted to be in Nabil and Barbara's home when they were not present.  The

agents also contend that they asked Michil if he had physical access to all areas of the house, and

he said yes.  Michil disputes that that question was asked or answered.  It is uncontested that the

agents did not ask Michil any further questions regarding his access to any particular areas or

containers in the house at any time.  Testimony of Daniels, Transcript of May 15, 2007, at 214;

Testimony of Schihl, Transcript of Dec. 15, 2006, at 41.

Beyond the knowledge of the agents were the following facts.  Michil never went into the

basement of the Smairat home before April 15, 2003.  Barbara was not aware of Michil's ever

having occasion to go into the master bedroom.  Nabil and Barbara did not give him any

authority over their personal or financial records.  Michil did not use at least three of the

computers that were seized, and he did not use the Jeep.  Additionally, Michil was not involved

with the Smart Choice business or the Smairats' Subway restaurant.[20]

By relying only on the agents' knowledge regarding Michil's general access to the

Smairat home, the government asks the court to assume that his consent was sufficient

justification to search any container that the agents found anywhere in the house.  The court

cannot make that leap.  *United States* v. *Rodriguez,* 888 F.3d at 524 ("[T]he United States has not

cited a single case approving a search of a closed container in consequence of a general consent

to enter the room in which it was found.")  Instead, whether the search was reasonable depends

on all of the circumstances of each container.  *Fultz*, 146 F.3d at 1105.

---

[20] The government has made no attempt to show that Michil had actual authority over any container. Therefore, the court will consider only whether Michil had apparent authority to the agents: whether it was reasonable for them to believe that Michil had access to or control over the containers to be searched.

Similar cases are instructive. In *United States* v. *Rodriguez*, 888 F.2d at 522, the defendant was a janitor in a union hall who sometimes slept in the janitor's closet because he and his wife were separated. His wife gave consent for officers to search the closet, but made no mention of any particular containers. *Id*. at 522-24. Officers opened and searched unmarked union boxes, another closed box, a briefcase, and a box on which the defendant's name was written. *Id*. at 522. Although the court agreed with the district court that the wife had apparent authority to consent to a search of the room, it found that that was not the relevant question. *Id*. at 523. The relevant question was instead whether the wife could and did consent to open the containers. *Id*. at 524. The government "elected not to address" that question, and the district court had therefore not focused on it, so the Seventh Circuit remanded the case for further factual findings. *Id*. at 524-25. It noted that it was possible that the defendant did not have a privacy interest in the union boxes, but implied that that was not necessarily so, and noted that it would be "hard to justify" searching the other containers based only on the wife's general consent. *Id*.

In *Fultz*, the defendant was staying in a friend's home after being evicted from his own. 146 F.3d at 1104. The friend allowed him to store his personal belongings, which were packed in closed (but apparently unmarked) cardboard boxes in her garage. *Id*. The friend gave police officers general consent to search her house, and the officers then opened the defendant's boxes. *Id*. The court held that to be unreasonable because there had been no showing that the friend had actual or apparent authority over the defendant's boxes: the friend had given the defendant a specific part of the garage to use, the defendant had never given the friend permission to look in the boxes and the friend had never done so, and the friend told the officers that the boxes contained the defendant's belongings and not her own. *Id*. Additionally, under the

circumstances with the defendant being essentially homeless and the boxes containing all of his belongings, he reasonably had a high expectation that they would remain private. *Id*. at 1105.

The defendant in *United States* v. *Davis*, 332 F.3d 1163, 1166 (9th Cir. 2003), shared a room with his girlfriend in a two-bedroom apartment and another woman, Smith, occupied the other bedroom. Officers went to the apartment and Smith consented to a search. Smith told the officers that the defendant and his girlfriend occupied the second bedroom and that the defendant kept all of his belongings in that bedroom. *Id*. The officers searched the defendant's bedroom, found a closed gym bag under the bed, opened it and searched it. *Id*. The court found that the defendant's act of storing the bag under the bed supported his expectation of privacy in the bag. *Id*. at 1168. Because the officers knew that the defendant's belongings were in an area separate from Smith's and had no indication that she had control over that area, the court found that Smith did not have actual or apparent authority to consent to the search of the bag. *Id*. at 1170.

In *United States* v. *Sealey*, 830 F.2d 1028, 1031 (9th Cir. 1987), the court did approve of a search of closed, unmarked boxes and other containers located in a garage based on the consent of the defendant's wife. Before searching the garage, the officers involved determined that the wife was legally married to the defendant, was part owner of the home, had a fifty per cent interest in the house, and had full access to all areas of the house including the garage. *Id*. In this situation, the facts that the containers were unmarked, the wife did not object to opening them, and they were not of the type commonly used to preserve privacy (such as suitcases, strong boxes, or footlockers) led the court to conclude that the wife did have valid authority to consent to their search. *Id*. In *United States* v. *Tucker*, 57 F. Supp. 2d 503, 516 (W.D. Tenn. 1999), the court used a similar line of analysis to conclude that a wife had the authority to consent to closed

23

ammunition boxes that were stored in a common area of the apartment. And finally, the court in *United States* v. *Robinson*, 999 F. Supp. 155, 162 (D. Mass. 1998), found that the mother of an adult son who lived in her home could consent to the search of a plastic movie box found in his room when it was not the type of container that warranted a high expectation of privacy and the son had done nothing to restrict access to it by other members of his family.

The court will consider the boxes first because resolving the question of Michil's authority over them will resolve easier issues in its wake. The boxes were closed and were stored in the Smairats' unfinished basement among filing cabinets, a safe, and shelving units. The placement of the boxes in this location shows an intention to keep them at least somewhat private. *See Davis,* 332 F.3d at 1166. Although the government contends in its pleadings that the boxes were unmarked, because no agent can recollect whether they were unmarked and the government has put forth no other evidence on this point, the court cannot assume that they were unmarked.[21] Upon opening each box, it would have been immediately apparent that they contained financial and business records, which are considered by most to be private documents.

The agents appear to have had no knowledge regarding Michil's use of, control over, or access to the boxes. They did not know if any of the boxes belonged to Michil, and a reasonable assumption would have been that they did not, because the agents knew that Michil slept in the office and kept at least some of his things there. The basement was a storage area for the family. The agents did not know whether Michil was involved in any of Nabil's businesses. They appear to have assumed that Michil had authority over the boxes or perhaps not considered the issue. "Deliberate ignorance of conclusive ownership of [a container] does not excuse the warrantless

---

[21] Even if the boxes were not marked, the court's finding on this issue would be the same.

search of the [container], especially when actual ownership could easily have been confirmed."
*Waller*, 426 F.3d at 849.  Actual ownership of or authority over the boxes could easily have been confirmed in this case, since Michil was sitting upstairs at the kitchen table at the agents' disposal.  Furthermore, Michil's status in the house was similar to a houseguest or a roommate, but in any case was less than that of a spouse.  Under these circumstances, it was unreasonable for the agents to proceed without any further inquiry, because based on the knowledge that they had at the time Michil did not have apparent authority to consent to a search of the boxes.

Because the court has found that Michil did not have apparent authority over the boxes in the basement, it follows that he also did not have apparent authority to consent to a search of the drawers or of containers that have a higher indicia of privacy, including the filing cabinets, the locked safe, and closed boxes in Nabil's and Barbara's closets.  The two computers found in the basement fall into the same category.  Moving on, the agents had no information regarding Michil's authority over the Jeep and its contents, the computer found in the office, and the additional computer.  Seizing these items based on Michil's consent without any further inquiry was also unreasonable.  Additionally, because the court has no information about where the seized keys were found, it must also conclude that their seizure based on Michil's consent was not reasonable.

This leaves only the $260,000, which was found in the basement in a Crock Pot.  Unlike closed boxes, whose privacy generally depends on their circumstances, a Crock Pot is the sort of container that most people assume is not private.  It is used for cooking, not generally for storing

private items, and the agents could properly assume that when they asked for consent to search the home for drugs, they could open a Crock Pot without inquiring about its ownership.[22]

Except for the Crock Pot, the government has not fulfilled its burden to show that Michil had apparent authority over all of the containers at issue. Michil did have authority to consent to the search of the Crock Pot, however, so the court must now move on to consider whether his consent was voluntary.

### B.    Voluntariness

To determine whether Michil's consent to search was voluntarily given, the court must first consider whether he was seized when the agents arrived. A seizure occurs when an "officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen[.]" *United States* v. *Jerez*, 108 F.3d 684, 689 (7th Cir. 1997) (citing *Terry* v. *Ohio*, 392 U.S. 1, 19 n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)). In situations where a person is approached in a confined space or a place of residence, "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter." *Jerez*, 108 F.3d at 689 (citing *Florida* v. *Bostick*, 501 U.S. 429, 436, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991); *Michigan* v. *Chesternut*, 486 U.S. 567, 576, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) (seizure occurred if "respondent could reasonably have believed that he was not free to disregard the police presence and go about his business.")). "The test is an objective one and requires a contextual approach." *Jerez*, 108 F.3d at 690. "In determining whether a stop is consensual, relevant factors include whether the encounter took place in public,

---

[22] Although no case that considers a defendant's privacy interest in a Crock Pot has been brought to the court's attention, it does appear that Crock Pots are sometimes used to make methamphetamine. *See United States* v. *Campbell*, 168 F.3d 263 (6th Cir. 1999); *United States* v. *Kissee*, 2007 WL 1726540 (W.D. Mo. June 12, 2007).

whether the suspect consented to speak to police, whether the officers told the suspect that he was not under arrest and free to leave, whether the suspect was moved to another area, the number of officers present and whether they displayed weapons or physical force." *United States* v. *Adamson*, 441 F.3d 513, 520 (7th Cir. 2006) (citations omitted).

Given the court's findings, Michil was seized when he stepped outside the garage of the Smairat home. As soon as he stepped outside, he saw at least a dozen agents surrounding the house, some of whom were wearing visible gun holsters. A large number of officers is not alone sufficient to turn an otherwise consensual encounter into a seizure, *McNair* v. *Coffey,* 279 F.3d 463, 466 (7th Cir. 2002), but in this case, where Michil was surrounded by officers on his own driveway, which he did not want to leave, he would not have felt free to just disregard their presence and go about his business (smoking a cigarette). "When a person is in a confined area, encircling the area in an intimidating fashion contributes to a reasonable belief that ignoring the law enforcement presence is not an option." *Jerez,* 108 F.3d at 692. The agents rushed up to Michil with their guns drawn and frisked him. Furthermore, the agents asked him questions in a strong tone of voice which would have intimidated a reasonable person. Despite the fact that he was clearly not a native English speaker, none of the agents asked Michil if he was willing to speak with them or advised him that he had a choice. They demanded (through words or tone) that he answer their questions and pressured him into inviting them inside. Michil would not have felt free to decline their requests or to terminate the encounter; instead, he would have felt overpowered and scared.

To justify their seizure, the agents needed to have at least a "reasonable suspicion supported by articulable facts that criminal activity 'may have been afoot.'" *Jerez,* 108 F.3d at

693 (citations omitted).  Because the agents' version of events does not include a seizure, they did not attempt to articulate any facts to justify a reasonable suspicion during the evidentiary hearing.  Agent Glynn, however, did mention the following:  "Q.: And what led you to believe that Michil Smairat posed any danger to you?  A. The fact that he was at a residence which possibly contained large amounts of drug proceeds, the fact that he was involved in a nation – this house – rather was involved in a nationwide drug conspiracy.  The fact that it was the middle of the day, and he was just standing outside his garage looking around."  Testimony of Glynn, Transcript of May 9, 2007, at 117-19.  Mere presence at a location that is suspected of drug activity, however, has been held insufficient to justify a reasonable suspicion that anyone present there is also involved in criminal activity.  *Brown* v. *Texas,* 443 U.S. 47, 52, 99 S. Ct. 2637, 61 L. Ed. 2d 357 ("The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct."); *United States* v. *Evans,* 994 F.2d 317, 322 (7th Cir. 1993) (same).  The fact that Michil Smairat was present at a house during the middle of the day cannot be grounds for a reasonable suspicion, even in combination with the possibility that it was a drug house.  Because no other facts have been alleged that could provide the basis for a reasonable suspicion that criminal activity was afoot, the agents' seizure of Michil was unreasonable.

Because an illegal seizure occurred, the voluntariness of Michil's consent depends on whether it was an independent act of free will sufficiently distinguishable from the primary taint, and if so, whether the consent was otherwise voluntary under the totality of the circumstances. Here, almost no time elapsed between when Michil was seized and when he consented to the agents' entry and search.  There were no intervening circumstances: Michil did not read the

consent to search form, no one read it to him, and the officers did not advise Michil that he had the right to say no to the search. Although the officers' conduct was not exceptionally flagrant, it was enough to intimidate Michil and to have a causal effect on his decision to consent. Therefore, the illegal seizure in this case vitiated Michil's subsequent consent. *See Jerez*, 108 F.3d at 695 (citing cases); *cf Pedroza*, 269 F.3d at 828 ("this is not a situation in which an illegal arrest or *Terry* stop is the sole reason the suspect is talking to the police at all.").

Even were this not the case, the court would hold that the government has failed to show that Michil's consent was voluntary. Although Michil is an intelligent adult, he speaks little English, which would have been apparent to the agents at the time. He was not advised of his constitutional right to say no to the officers and it is apparent that he did not feel able to refuse them. He was seized at the time of the consent, a large number of officers were present, they were armed, and at least some had visible weapons. For all of these reasons, the court finds that Michil's consent to the search of the Smairat home was not voluntary. Therefore, unless the search was reasonable based on Barbara's consent, all of the evidence found must be suppressed.

### C.  Barbara's consent

The government argues that in any event, regardless of the sufficiency of Michil's consent, the entire search, including the search of the containers, is justified by Barbara's consent on the theory of inevitable discovery. As noted above, it is undisputed that Schihl called Barbara at work to inform her that her husband had been arrested and that federal agents were searching her home. Barbara said she would come home. When she arrived, the search was well underway and agents were in the process of taking boxes out of her house and loading them into government vehicles. The court has further found that Barbara went inside the house, had a

29

discussion with Schihl about Nabil's arrest, saw numerous agents conducting an extensive search of her home, was told that her consent was not necessary, and was shown $260,000 that had been hidden in her basement all before she signed the consent to search form. Nabil argues that Barbara's consent was insufficient because it was the result of the government's prior illegal seizure and search and was therefore tainted.

To determine whether Barbara's consent was tainted by the prior illegal seizure and search of Michil and the Smairat home, the court must consider "'whether the evidence was come at by exploitation of the initial illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint.'" *United States* v. *Robeles-Ortega*, 348 F.3d 679, 681 (7ᵗʰ Cir. 2003) (emphasis in original) (citing *United States* v. *Valencia*, 913 F.2d 378, 382 (7ᵗʰ Cir. 1990)). In doing so, the court again considers "'(1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct,' although none of these factors alone is determinative.'" *Pedroza,* 269 F.3d at 828 (citing *Wong Sun* v. *United States*, 371 U.S. 471, 521, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). The government has the burden of persuasion to show that the causal connection between the illegal act and the later consent was broken. *Robeles-Ortega*, 348 F.3d at 683.

In *Valencia*, officers entered the defendant's apartment before he arrived home. 913 F.2d at 381. Assuming that entry was illegal, the court found that it did not taint his later consent to search because "[t]he agents did not exploit the initial entry. The police found no evidence as a result of that entry, and discovered no information that they used (or could use) to influence Valencia to consent to a search." *Id*. at 382. The district court had also found that under the facts

of the case, the agents' presence in the apartment was not so coercive as to render the defendant's consent involuntary. *Id.* Therefore, the Seventh Circuit affirmed the finding that the defendant's consent was sufficiently independent of the allegedly illegal entry into his apartment that the two events were attenuated and any possible taint was dissipated. *Id.*

In contrast, the facts of this case show that Barbara's consent was tainted by the officers' presence in her home and their exploitation of the illegal search that was well underway by the time she arrived. Here, the agents did not merely do a sweep of the house for people or weapons and then wait for the homeowner to return, as the officers did in *Valencia*. When Barbara arrived home, she encountered a large number of federal agents who had already made substantial progress in a thorough search of her home and were carrying the proceeds out to their vehicles. Most importantly, the court has found that before she consented to the search, Barbara was shown some incriminating evidence that the search had already turned up: the $260,000, and that she was told that her consent was not actually necessary because Michil had already consented. Under these circumstances, the court is constrained to conclude that Barbara's consent was tainted. Therefore, it cannot provide independent justification for the search.[23]

## IV. Conclusion and Order

For the reasons discussed above, Nabil Smairat's motion to suppress evidence found during the search of his house on April 15, 2003 [#18, 21] is granted.

Dated: August 8, 2007                    ENTER: *Joan H. Lefkow*
                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge

---

[23] Alternatively, the government has made no showing to support its argument that the evidence found during the search would have been inevitably discovered, as the court directed it to do in its Memorandum Decision of June 1, 2006 (Dkt. No. 54) ("[T]he court will require the government to prove by a preponderance of the evidence at an evidentiary hearing that the authorities would have found this evidence through lawful means.").